RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0035p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

             *Plaintiff-Appellee*,

      *v*.

ZACHARIAH JAY HISTED,

             *Defendant-Appellant*.

> No. 22-2080

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:22-cr-00014-1—Robert J. Jonker, District Judge.

Argued: December 6, 2023

Decided and Filed: February 22, 2024

Before: MOORE, MURPHY, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Dennis C. Belli, Columbus, Ohio, for Appellant. Daniel T. McGraw, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Dennis C. Belli, Columbus, Ohio, for Appellant. Daniel T. McGraw, UNITED STATES ATTORNEY'S OFFICE, Grand Rapids, Michigan, for Appellee.

MATHIS, J., delivered the opinion of the court in which MOORE, J., joined. MURPHY, J. (pp. 16–23), delivered a separate opinion concurring in part and dissenting in part.

───────────────

## OPINION

───────────────

MATHIS, Circuit Judge. Zachariah Histed pleaded guilty to possessing methamphetamine with intent to distribute, and the district court sentenced him to 300 months'

imprisonment.  Histed appeals his sentence on procedural and substantive grounds, arguing that the district court improperly calculated the drug quantity, erroneously applied multiple sentencing enhancements, wrongfully denied him credit for acceptance of responsibility, and imposed a sentence that was too long.  For the following reasons, we affirm in part, vacate Histed's sentence, and remand for resentencing.

**I.**

In late 2021, Histed was on parole for a state methamphetamine-trafficking conviction when the Michigan State Police began to suspect him of trafficking meth again.  Two confidential informants told the police that Histed frequently trafficked "pounds" of meth from Detroit, Michigan, to western Michigan.  R. 66, PageID 341–42.  Their tips led police to surveil Histed on January 12, 2022.  That evening, Histed drove his Ford F-150 to a Detroit residence that police suspected was a "drug house."  *Id.* at 357–59.  After he left, police tracked Histed as he drove westbound on I-96.  They observed Histed speeding, littering, and improperly switching lanes, so a state trooper attempted to pull Histed over.  Histed pulled over to the shoulder and began to slow down, but never came to a complete stop.  Instead, he suddenly sped off, passing other vehicles on the shoulder, and weaving in and out of traffic despite the congestion on the highway.

Histed exited I-96 near Okemos, Michigan.  Officers eventually found his F-150 abandoned in a parking lot and saw footprints leading into a nearby forest.  Officers followed the footprints with a K9 unit, finding a bag containing 122.2 grams of pure methamphetamine ("ice") just off the path.[1]  After failing to locate Histed, the officers returned to search the F-150.  When they opened the driver's door, they saw what appeared to be a grenade on the vehicle's floorboard.  The officers were concerned enough about the grenade that they called in the bomb squad.  The bomb squad determined that the grenade did not contain any explosive materials; it was inert and harmless.  Once the bomb squad cleared the grenade, the officers searched the F-150 and found a document that looked like a drug ledger, a glass methamphetamine pipe, a paper plate with a note indicating a willingness to sell a quarter pound (approximately 113

---

[1]"Ice," for purposes of the Sentencing Guidelines, "means a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity."  U.S.S.G. § 2D1.1(c) n.(C).

grams) of meth for $1,100, and five empty heat-sealed bags. The ledger had four names crossed off with an amount of money next to each name, which totaled over $1,000, but the ledger did not contain any information about a quantity or type of drug. Residue in one of the heat-sealed bags field-tested positive for meth, and an officer testified at sentencing that each bag could hold one to two pounds of meth.

Meanwhile, Histed continued his escape. After getting away from his F-150 on foot, he called his daughter, Tayley Histed, and asked her to pick him up from Okemos. She came to Okemos and drove her father to his principal residence in Lansing. While inside that residence, Histed handed Tayley a gun case and told her to take it with her. He also told Tayley to instruct her grandmother (Histed's mother) to report the F-150 as stolen, as the truck was registered in the grandmother's name. Tayley followed Histed's instructions.

The next day, January 13, police arrived at Tayley's residence—which was listed as Histed's parole address—with a search warrant. There, the police found a semiautomatic rifle in the trunk of Tayley's vehicle, which Tayley confirmed she had received from her father the previous night.

A federal grand jury indicted Histed for: (1) possession of 50 grams or more of methamphetamine with intent to distribute, and (2) being a felon in possession of a firearm. While Histed was in jail, officers intercepted two letters he sent to Tayley. One of the letters purported to tell someone named Burt that he forgot his rifle in Tayley's trunk after he went shooting. A second letter instructed Tayley to call Burt and tell him to say that the gun was his. Histed also sent another letter instructing a third party go to the police and accuse a person who had recently died of stealing Histed's F-150 on the night Histed fled the police. Eventually, Histed gave up on these attempts to disassociate himself from his gun and truck, and he pleaded guilty to the drug offense. In return, the government agreed to dismiss the felon-in-possession charge and agreed not to oppose Histed's request for a Guidelines reduction for acceptance of responsibility if Histed continued to accept responsibility.

In the presentence report, the probation officer calculated Histed's base offense level as 34 based on the quantity of methamphetamine allegedly attributable to him. The presentence

report also recommended sentencing enhancements for possession of a dangerous weapon (for both the rifle and the inert grenade), obstruction of justice, and reckless endangerment during flight. It did not propose a reduction for acceptance of responsibility. Histed objected to all of these recommendations, arguing that his base offense level should be 30 (based on only the 122.2 grams of ice that he admitted to possessing), that no enhancements should apply, and that he should receive an acceptance-of-responsibility reduction.

At the sentencing hearing, the district court found that Histed's base offense level was 32, less than what the presentence report recommended but more than what Histed requested. The district court indicated it had "no doubt" that Histed trafficked enough methamphetamine to fall within level 32 because drug trafficking "was an ongoing activity for Mr. Histed, [and] he was regularly engaged in the drug trafficking trade." R. 66, PageID 456. The court never settled on a specific amount of methamphetamine to attribute to Histed, acknowledging that "it's very hard by a preponderance or otherwise to drill down exactly how much is fairly put on him." *Id.* The court overruled Histed's objections to the sentence enhancements and declined a reduction for acceptance of responsibility.

All told, the district court determined Histed's advisory Guidelines range was 360 months to life imprisonment. But the district court varied downward, sentencing Histed to 300 months' imprisonment.

## II.

We review the reasonableness of criminal sentences under the deferential abuse-of-discretion standard. *United States v. Battaglia*, 624 F.3d 348, 350 (6th Cir. 2010); *see United States v. Nunley*, 29 F.4th 824, 830 (6th Cir. 2022). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, when it improperly applies the law, or uses an erroneous legal standard." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 218 (6th Cir. 2019) (quoting *Stough v. Mayville Cmty. Schs.*, 138 F.3d 612, 614 (6th Cir. 1998)).

We review the district court's legal conclusions de novo and its findings of fact for clear error. *Nunley*, 29 F.4th at 830. A district court's factual finding is "clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with

the definite and firm conviction' that the district court made a mistake." *United States v. Ellis*, 938 F.3d 757, 761 (6th Cir. 2019) (quoting *United States v. Vasquez*, 352 F.3d 1067, 1070 (6th Cir. 2003)).

Histed challenges the procedural and substantive reasonableness of his sentence. Procedural reasonableness requires district courts to "properly calculate the [G]uidelines range, treat the [G]uidelines as advisory, consider the [18 U.S.C.] § 3553(a) factors and adequately explain the chosen sentence." *United States v. Morgan*, 687 F.3d 688, 693 (6th Cir. 2012). Substantive reasonableness, on the other hand, concerns "whether the sentencing court gave reasonable *weight* to each" of the relevant § 3553(a) factors. *United States v. Boucher*, 937 F.3d 702, 707 (6th Cir. 2019); *see Nunley*, 29 F.4th at 830. This inquiry, when raised by a defendant, addresses "a claim that a sentence is too long." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018).

**III.**

Histed argues that the district court erred in six ways. First, Histed argues that the district court erred in determining the quantity of methamphetamine attributable to him. Second, Histed maintains that he did not possess a dangerous weapon during his drug-trafficking activities and, therefore, the district court should not have applied the dangerous-weapon enhancement. Third, he argues that the reckless-endangerment enhancement should not apply because his flight from law enforcement did not create a substantial risk of danger to others. Fourth, he contends that he did not engage in obstructive conduct that warranted the obstruction-of-justice enhancement. Fifth, Histed believes that the district court should have applied a reduction for acceptance of responsibility. And sixth, Histed argues that his sentence was substantively unreasonable. We address each argument in turn.

**A.**

*Drug-quantity determination.* We first consider whether the district court properly calculated the amount of methamphetamine attributable to Histed. The district court found Histed responsible for enough methamphetamine to qualify for offense level 32. This means that the district court credited Histed with 1.5 to 5 kilograms of methamphetamine (mixture), or 150

to 500 grams of methamphetamine (actual) or ice.  U.S.S.G. § 2D1.1(c)(4).  Because the district court did not adequately explain how it arrived at offense level 32, we vacate Histed's sentence.

We will uphold a district court's drug-quantity determination unless it is "clearly erroneous."  *United States v. Gardner*, 32 F.4th 504, 524 (6th Cir. 2022).  At sentencing, the government must prove "the weight of any drugs."  *United States v. Hill*, 79 F.3d 1477, 1488 (6th Cir. 1996).  To calculate drug quantity, "[t]he district court can make a reasonable estimate based on physical evidence or testimony."  *United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020).  "[A] preponderance of the evidence" must support the district court's estimate. *United States v. Johnson*, 732 F.3d 577, 581 (6th Cir. 2013).  The evidence that the district court relies on to support the estimate "must have a minimal level of reliability" and the court should "err on the side of caution in making its estimate."  *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004) (quoting *United States v. Owusu*, 199 F.3d 329, 338 (6th Cir. 2000)).  This ensures that the "defendant is actually more than likely responsible" for more drugs than what the court uses in calculating the drug quantity.  *United States v. Long*, 190 F.3d 471, 478 (6th Cir. 1999).  The district court must specify the evidence upon which it relies to make the drug-quantity determination and make specific factual findings.  *Id.*  To that end, district courts must articulate the methodology they use and explain how they arrived at the "final figure" because "it is especially important to create a clear record to facilitate appellate review."  *United States v. Woodside*, 642 F. App'x 490, 496 (6th Cir. 2016).

We have affirmed district courts' drug-quantity determinations that used ascertainable methodologies to arrive at a conservative estimate of drugs.  *See Tisdale*, 980 F.3d at 1096–97; *United States v. Fitzgerald*, 754 F. App'x 351, 367–68 (6th Cir. 2018).  In *Tisdale*, for instance, the district court heard evidence that a gang "moved between half a pound and a pound of marijuana every day" over the course of three years, allowing it to hold the defendant accountable for "hundreds of kilograms" of marijuana.  *Tisdale*, 980 F.3d at 1096–97; *see also United States v. Hayward*, No. 22-3533, 2023 WL 3886407, at *3 (6th Cir. June 8, 2023) (holding that the district court did not clearly err in attributing approximately thirteen pounds, or six kilograms, of methamphetamine to the defendant based on the seizure of fifteen bags of methamphetamine that each field-tested positive for the drug and weighed approximately one

pound); *United States v. Murillo-Almarez,* 602 F. App'x 307, 311 (6th Cir. 2015) (affirming the district court's calculation of "the amount [of heroin] involved by dividing the total amount of money recovered in connection with the conspiracy by the typical street price per gram of heroin").

On the other hand, we have vacated sentences when the district court failed to explain its drug-quantity calculation. Recently, in *United States v. Reed*, we vacated the defendants' sentences because the district court failed "to engage in the particularized factfinding as to the quantity and purity of the meth for which each defendant should be held responsible." 72 F.4th 174, 192 (6th Cir. 2023). Similarly, in *Woodside*, we vacated the defendant's sentence and remanded "for a better explanation of the district court's calculation, or for recalculation" when the court did not leave any "record of the numbers [it] used" to estimate drug quantity. 642 F. App'x at 496; *cf. United States v. Orlando*, 281 F.3d 586, 600–01 (6th Cir. 2002) (vacating sentence and remanding for a better explanation when district court indicated only that its calculation of the sum of money defendant laundered was "based on the evidence at trial and sentencing").

The parties did not dispute Histed's responsibility for 122.2 grams of ice. That amount would place Histed at base offense level 30. *See* U.S.S.G. § 2D1.1(c)(5). Thus, to reach offense level 32, the district court needed to attribute to Histed approximately 30 additional grams of ice or methamphetamine (actual), or 300 additional grams of methamphetamine (mixture). Here, the district court did not provide a reasonable estimate of the drug quantity that Histed was responsible for, nor did it articulate any methodology for reaching an offense level of 32. Although the district judge stated that he had "no doubt" Histed trafficked enough drugs to reach level 32, he did not explain why he was so sure or point to specific evidence that made that drug quantity clear. It appears that the judge generally surveyed the evidence in front of him and determined "that this was an ongoing activity for Mr. Histed, that he was regularly engaged in the drug trafficking trade." R. 66, PageID 456. But "a determination that [Histed's] drug activity was substantial does not translate readily into a specific drug quantity finding." *United States v. Miele*, 989 F.2d 659, 668 (3d Cir. 1993). That is what our cases require the district

court to do: determine a conservative estimate of the amount of drugs that the defendant trafficked. And the district court must show its work on the record to enable appellate review.

We recognize that creating such a record is no small task and "[w]e are mindful that district courts sometimes struggle to calculate drug quantities in complex cases." *Woodside*, 642 F. App'x at 496. We also understand the district court's position that "it's very hard . . . to drill down exactly how much is fairly put on [Histed]." R. 66, PageID 456. But the district court must at least try to do so. We require "more than a conclusory finding" that Histed trafficked enough drugs to reach level 32. *Miele*, 989 F.2d at 668. The district court must, at a minimum, find facts as to the quantity of drugs for which Histed bears responsibility and explain its methodology for reaching that drug quantity. *See Reed*, 72 F.4th at 192–93; *Woodside*, 642 F. App'x at 496. In other words, the district court cannot just eyeball it. It must do some math.

The government, in its brief and at oral argument, and the dissent have proposed several methods that the district court could have used to reach offense level 32. But the problem is that the district court did not use those methods. The unanswerable questions posed by the dissent underscore our conclusion. *See* Dissent at 20. Although the district court explained that it relied on "physical evidence," we "do not know" whether the district court relied on the empty heat-sealed bags found in Histed's truck or the money listed on the drug ledger, or some other piece of evidence. *Id.* Without sufficient information about how the district court came to its conclusion, we cannot meaningfully review its analysis.[2]

For the reasons outlined above, the district court procedurally erred in making its drug-quantity determination. Therefore, we will remand this case to the district court for resentencing to make the particularized factfinding as to the drug quantity attributable to Histed. On remand, the court should limit its review to the evidence in the record in making its drug-quantity determination; the government will not get a "second bite at the apple" to present additional

---

[2]The dissent also incorrectly suggests that this court does not require "mathematical" precision. Dissent at 20. To support this assertion, the dissent cites cases in which the district court *did* identify estimates with some mathematical precision by stating a numerical range of drug quantity and explaining the evidence that supported those numbers. *See, e.g.*, *Gardner*, 32 F.4th at 524 (affirming the district court's conclusion that the defendant was responsible for "five to 15 kilograms of cocaine" based on testimony that the defendant coordinated transactions for 2.5 kilograms of cocaine, 4.5 kilograms of cocaine, and 5 kilograms of cocaine). Here, the district court identified no such numerical range or evidence.

evidence on this issue that it did not use at Histed's original sentencing hearing. *United States v. Mukes*, 980 F.3d 526, 540 (6th Cir. 2020) (quoting *United States v. Goodman*, 519 F.3d 310, 323 (6th Cir. 2008)).  However, we will not (as Histed urges) direct the district court to resentence Histed using a base offense level of 30.

**B.**

*Dangerous-weapon enhancement.*   The dangerous-weapon enhancement authorizes a two-level increase to a defendant's offense level if the defendant possessed "a dangerous weapon" during a drug-trafficking offense.  U.S.S.G. § 2D1.1(b)(1).  A dangerous weapon is not just "an instrument capable of inflicting death or serious bodily injury"; it is also an object that "closely resembles such an instrument." *Id.* § 1B1.1 cmt. n.1(E); *cf. United States v. Tate*, 999 F.3d 374, 378 (6th Cir. 2021) (holding that "the phrase 'dangerous weapon' . . . encompasses not only objects that are per se dangerous, but also those that, by their objective appearance, create the possibility of danger").  Thus, the enhancement applies when the defendant threatens others with an object that turns out to be harmless, such as in *McLaughlin v. United States*, where the defendant used an unloaded gun during a robbery. *Cf.* 476 U.S. 16, 17–18 (1986) (holding that an unloaded handgun is a dangerous weapon under the federal bank-robbery statute); *Tate*, 999 F.3d at 376 (applying the dangerous-weapon enhancement under U.S.S.G. § 2B3.1(b)(2)(E) when a bank robber stuck his hand inside a bag to make it look like he had a gun when he had no weapon at all).

District courts must employ our "burden-shifting framework" to determine if the dangerous-weapon enhancement applies. *United States v. Kennedy*, 65 F.4th 314, 318 (6th Cir. 2023).  The government must first prove by a preponderance of the evidence that the defendant (1) possessed the weapon (2) during the commission of the offense. *United States v. McCloud*, 935 F.3d 527, 531 (6th Cir. 2019).  If the government satisfies its burden, the defendant must then "show that it was 'clearly improbable' that the weapon was connected to the offense." *Kennedy*, 65 F.4th at 318 (quoting *United States v. Catalan*, 499 F.3d 604, 606 (6th Cir. 2007)).  Only "evidence, not mere argument," will suffice for the defendant to meet his burden. *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012), *abrogated on other grounds by N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).  To that end, the defendant must point to

evidence that he possessed the weapon for "a nondrug-related reason." *United States v. Wheaton*, 517 F.3d 350, 368 (6th Cir. 2008).

The district court applied the dangerous-weapon enhancement after finding that Histed possessed a rifle and an inert grenade during his drug-trafficking offense. To uphold the district court's application of the enhancement, we need find only that the enhancement applies to one of the weapons.

The district court did not clearly err by applying the dangerous-weapon enhancement to the inert grenade. The grenade, while harmless, "closely resembled" a real one, enough to convince the police to call the bomb squad to disarm it. R. 66, PageID 365; U.S.S.G. § 1B1.1 cmt. n.1(E). The district court also saw a picture of the grenade in question and noted that "it looks like a hand grenade." R. 66, PageID 452. And it was "present during relevant conduct" because the police found it in Histed's truck shortly after he ran from the vehicle after trafficking methamphetamine. *United States v. Wallace*, 51 F.4th 177, 183 (6th Cir. 2022). The burden thus shifted to Histed to present evidence that it was clearly improbable that the inert grenade was related to his offense. *Wheaton*, 517 F.3d at 368. Histed presented nothing. Although his trial attorney *argued* that the grenade could be a paperweight that one could purchase online and presented evidence that fake grenades are available for purchase, he presented no evidence substantiating the assertion that the grenade found in Histed's truck was actually a paperweight. Moreover, Histed did not provide any reason why a paperweight would be found on the driver-side floorboard of his truck, as opposed to somewhere paperweights are more traditionally kept, making the argument a "bare assertion" insufficient to carry Histed's burden. *Id.*

Histed argues that the grenade was analogous to the Guidelines application note that states "the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet." U.S.S.G. § 2D1.1 cmt. n.11(A). "The discovery of the rifle," as Histed explains it, "could conceivably cause a search team to go on heightened alert and/or request back up personnel." D. 20 at p.27. We disagree. The inert grenade was found amongst drug paraphernalia in a truck that the police observed Histed use to traffic drugs earlier that same day, not sitting in a house closet well away from drug activity. And searchers would not be concerned that an unloaded rifle threatens their safety if it is well out

of the suspect's reach. Histed could, however, employ an inert grenade within his reach as a threat of violence. Accordingly, Histed has failed to meet his burden to show that it was clearly improbable that the inert grenade was connected to the drug offense.

Because we hold that the district court properly applied the dangerous-weapon enhancement to the inert grenade, we need not consider whether Histed's rifle could have served as an independent basis for the same enhancement.

**C.**

*Reckless-endangerment enhancement*. The reckless-endangerment enhancement applies "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. The government must prove that the defendant:

> (1) recklessly, (2) created a substantial risk of death or serious bodily injury, (3) to another person, (4) in the course of fleeing from a law enforcement officer, (5) and that this conduct occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

*Mukes*, 980 F.3d at 536 (quoting *United States v. Dial*, 524 F.3d 783, 786–87 (6th Cir. 2008)). This is a "highly fact-based" inquiry. *United States v. Hazelwood*, 398 F.3d 792, 796 (6th Cir. 2005). Accordingly, we give "significant deference" to the district court's resolution of this "mixed question of law and fact." *Id.*

Here, the district court heard testimony about Histed's highway escape and watched a dashcam video of the incident. It heard and saw evidence that Histed initially pulled over and slowed down for the marked police car, but as soon as the police car slowed, Histed accelerated. In front of him were two cars on a two-lane highway, so Histed got on the shoulder and sped around them. Histed then continued speeding down the highway and wove in and out of traffic. He did all this while driving a large pickup truck at night. Speeding at night while weaving in and out of traffic and passing cars on the shoulder is well outside the ordinary driver's standard of care and creates a substantial risk of an accident. *See* U.S.S.G. §§ 2A1.4 cmt. n.1; 3C1.2 cmt. n.2. Histed earned the enhancement.

Histed argues that he was not necessarily speeding because the posted speed limit of 70 miles per hour was still a "high rate of speed," so just considering the speed of his vehicle was not enough. D. 20 at p.37. But there is no dispute that Histed passed other cars while driving on the highway's shoulder. The district court reasonably concluded that anyone that passed cars while driving on the shoulder was probably speeding. And passing cars on the shoulder is so divorced from the normal standard of care that it constitutes reckless driving even if Histed was not speeding. *See* U.S.S.G. § 2A1.4 cmt. n.1.

Histed also complains that the district court did not specifically find that his driving created a "substantial" risk of harm. *Id.* § 3C1.2. But just because the court did not use the word "substantial" does not mean it did not find that Histed created a substantial risk. The general tone of the court's reasoning on this issue shows that it believed that Histed seriously endangered people. The district court did not need to use any "magic words" when making its decision. *See United States v. Pineda-Duarte*, 933 F.3d 519, 525 (6th Cir. 2019) (citation omitted).

**D.**

*Obstruction-of-justice enhancement*. Section 3C1.1 of the Guidelines calls for a two-level enhancement if (1) "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offence of conviction" and (2) the obstruction related to the offense conduct. Obstruction includes any willful action that "'block[s],' 'make[s] difficult,' or 'hinder[s].'" *United States v. Thomas*, 933 F.3d 605, 610 (6th Cir. 2019) (citation omitted). Section 3C1.1's commentary includes a nonexhaustive list of obstructive conduct, including "threatening, intimidating, or otherwise unlawfully influencing" witnesses and "committing, suborning, or attempting to suborn perjury." U.S.S.G. § 3C1.1 cmt. n.4(A), (B). The obstruction must also be material in that it would tend to influence the investigation's outcome if the investigator believed the obstructive statements. *Thomas*, 933 F.3d at 610. In *United States v. Huntley*, for instance, we affirmed the district court's application of the obstruction enhancement when the defendant asked another person to convince the defendant's nephew to take responsibility for a crime the defendant committed. 530 F. App'x 454, 455–58 (6th Cir. 2013). And in *United States v. Bingham*, we affirmed the enhancement's application to a defendant who

tried to convince his girlfriend to testify falsely that his gun belonged to her. 81 F.3d 617, 632 (6th Cir. 1996).

We have "sent mixed messages" about the standard for reviewing a district court's application of the obstruction-of-justice enhancement. *Thomas*, 933 F.3d at 608. While we certainly review legal conclusions de novo and factual findings for clear error, we have not settled on what deference we give the district court's application of § 3C1.1 to the facts. *Id.* (collecting cases). We do not need to resolve that conflict here because Histed's challenge fails under any standard.

Histed instructed others—including his own mother and daughter—to lie in the hope that they would exculpate him. He instructed his mother to tell police that his F-150 was stolen; instructed his daughter to get a friend to claim Histed's gun as his own; and told his daughter to ask another friend to claim that a deceased person stole his F-150. These facts line up almost perfectly with *Huntley*. Like *Huntley*, where the defendant obstructed justice when he instructed a family member to say the family member committed a crime that the defendant had in fact committed, Histed instructed his family members and others to falsely claim they possessed the vehicle and gun Histed used in his crimes at the time he committed them. *See* 530 F. App'x at 455–56. Histed's conduct also tracks the Guidelines' plain text. With his letters, Histed sought to impede the investigation by fooling investigators into thinking others possessed his truck and gun when they did not. *See* U.S.S.G. § 3C1.1. The fact that Histed failed in his endeavor does not matter; the Guidelines consider the "*attempt*[] to obstruct or impede" an investigation to be just as serious as successfully doing so. *Id.* (emphasis added). And if the investigators had believed the false information Histed provided, Histed would have at least delayed the investigation. *See Thomas*, 933 F.3d at 610–11.

Histed argues that *Huntley* does not apply because that defendant argued on appeal that he did not take a substantial step to obstruct justice. So, as Histed sees it, *Huntley* did not directly opine on whether lying to investigators was obstructive conduct. But it appears that is because everyone involved took as a given the rather commonsense proposition that lying to the police about an ongoing investigation obstructs justice. The only question to resolve was whether instructing someone else to lie to investigators was an overt act sufficient to trigger the

obstruction enhancement, and we said it was.  *Huntley*, 530 F. App'x at 457–58.  At bottom, in *Huntley*, we considered facts very similar to the ones we have before us and decided the enhancement applied.  *See id.*

Histed also argues that the district court erred by relying on § 3C1.1's application note 4(A) when deciding that the enhancement applies.  That note explains that "threatening, intimidating, or otherwise unlawfully influencing" a witness is obstruction, U.S.S.G. § 3C1.1 cmt. n.4(A), and the district court said that Histed unlawfully influenced his mother, daughter, and other potential witnesses.  Histed argues that, according to the *ejusdem generis* canon of statutory construction, we must interpret "otherwise unlawfully influencing" in a manner consistent with the words it follows.  *See* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 199–200 (2012).  This argument might work if Histed applied it to a statute or the Guidelines themselves.  But he seeks to apply the canon to a nonexhaustive and non-binding list in the application notes.  Histed's conduct need not fall perfectly under note 4(A) to be considered obstructive.  The district court acknowledged the list's nonexhaustive character and did not rely solely on note 4(A), noting that Histed's conduct was analogous to many of the list's acts, including "providing materially false information to a judge."  *See* U.S.S.G. § 3C1.1 cmt. n.4(F).  The district court did not clearly err by citing note 4(A) for the obvious proposition that tampering with witnesses obstructs justice.

**E.**

*Acceptance of responsibility.*  The Guidelines authorize a two-level reduction to the base offense level if the defendant demonstrates acceptance of responsibility and an additional one-level reduction if the defendant timely notifies the government that he intends to plead guilty and forgo a trial.  U.S.S.G. § 3E1.1.  Generally, a defendant found to have obstructed justice (as is the case here) will receive an acceptance-of-responsibility credit only in "extraordinary cases."  *Id.* § 3E1.1 cmt. n.4.  A defendant found to have obstructed justice can still receive an acceptance-of-responsibility reduction if his "obstructive conduct predated the . . . guilty plea," *United States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003), but only if he "eventually accepts responsibility for the crime and abandons all attempts to obstruct justice," *United States v. Hopper*, 27 F.3d 378, 383 (9th Cir. 1994).

We give "great deference" to a "district court's decision to deny an acceptance-of-responsibility reduction." *United States v. McCloud*, 730 F.3d 600, 605 (6th Cir. 2013) (quoting *United States v. Genschow*, 645 F.3d 803, 813 (6th Cir. 2011)).

Although Histed's obstructive conduct preceded his guilty plea, he continued to demonstrate a lack of acceptance of responsibility up to the time of sentencing. The district court signaled that had Histed fully owned up to his crime after pleading guilty, it would not have held this obstructive conduct against him. Instead, the court denied an acceptance-of-responsibility reduction based on what Histed said and did after pleading guilty. Histed told the probation officer during his presentence interview that he possessed methamphetamine only once because he was collecting a debt for a friend. Then, during his allocution at sentencing, Histed repeated his debt story and claimed that the alleged drug ledger found in his car was just him keeping track of his savings to buy someone a car. The district court did not believe these stories—calling them "offensive"—and took them as a sign that Histed still had not accepted responsibility for his actions. R. 66, PageID 459. Given this record, the district court did not clearly err by doing so.[3]

## IV.

For these reasons, we **AFFIRM** the application of the dangerous-weapon, reckless-endangerment, and obstruction-of-justice enhancements and the denial of acceptance-of-responsibility credit. We **VACATE** Histed's sentence and **REMAND** for resentencing consistent with this opinion. Although the district court may not consider additional evidence in making its drug-quantity determination, nothing precludes the district court from considering new arguments and evidence about Histed's "background, character, and conduct" in "imposing an appropriate sentence." *See* 18 U.S.C. § 3661; *Pepper v. United States*, 562 U.S. 476 (2011).

---

[3]Histed also argues that his sentence is substantively unreasonable. Because we are vacating Histed's sentence due to a procedural error, we need not address the substantive reasonableness of the sentence.

———————————————

## CONCURRENCE / DISSENT

———————————————

MURPHY, Circuit Judge, concurring in part and dissenting in part. I concur in those parts of Judge Mathis's thoughtful opinion that reject Zachariah Histed's challenges to his 300-month sentence. But I respectfully dissent from my colleagues' holding that the district court did not adequately justify the drug quantity it attributed to Histed at sentencing. All agree that the court properly relied on the 122.2 grams of "ice" (high-purity methamphetamine) that Histed dropped when he fled from the police. But the court also held Histed responsible for at least another 30 grams of ice or 300 grams of a meth mixture. What did it base this additional amount on? In my view, the record leaves no doubt that the court relied on the evidence of drug trafficking found in Histed's truck. The truck contained, among other things, a drug ledger and an emptied heat-sealed bag with residue that tested positive for methamphetamine. Given this physical evidence, I see no "clear error" in the district court's conservative estimate of the additional drugs that Histed distributed. So I would affirm the court's sentence outright.

To explain my reasoning, I start with the general framework. The base offense level (and thus the guidelines range) for Histed's drug offense depends on the quantity of drugs involved. U.S.S.G. § 2D1.1(a)(5), (c). "The greater the quantity, the greater the sentence." *United States v. Crowe*, 2023 WL 4586154, at *6 (6th Cir. July 18, 2023). A district court must make the quantity finding under the "preponderance-of-the-evidence" ("more likely than not") standard. *United States v. Gardner*, 32 F.4th 504, 525 (6th Cir. 2022); *United States v. Walton*, 908 F.2d 1289, 1301–02 (6th Cir. 1990). But the court need not limit itself to the evidence that supports the quantities listed in the defendant's "count of conviction[.]" U.S.S.G. § 2D1.1 cmt. 5. It may also rely on drug quantities connected to a defendant as part of the "[r]elevant [c]onduct" of the crime. *Id.* (citing U.S.S.G. §1B1.3(a)(2)); *United States v. Smith*, 887 F.2d 104, 108 (6th Cir. 1989).

The evidence often will not permit a district court to identity the total drug quantity with "mathematical certainty[.]" *United States v. Baker*, 750 F. App'x 434, 437 (6th Cir. 2018). District courts thus have leeway to make logical inferences from the tangible items that police

officers uncover or from the statements that witnesses make. *See United States v. Tisdale*, 980 F.3d 1089, 1096 (6th Cir. 2020); *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008). Consider two precedent-inspired examples. A court may estimate the drug quantity by calculating the amount of drugs that could fit within recovered empty packages. *See United States v. Caro-Silva*, 815 F. App'x 836, 841–42 (6th Cir. 2020); *United States v. Phipps*, 524 F. App'x 209, 213–14 (6th Cir. 2013); *United States v. Smartt*, 60 F. App'x 549, 550–51 (6th Cir. 2003) (order). And a court may estimate the drug quantity by dividing the money recovered from a defendant by the street value of the drug the defendant sold. *See United States v. Murillo-Almarez*, 602 F. App'x 307, 311 (6th Cir. 2015); *United States v. Anderson*, 526 F.3d 319, 327 (6th Cir. 2008).

Although a district court may make a "reasonable estimate," *Tisdale*, 980 F.3d at 1096, we still impose procedural and substantive "checks" on its chosen number. Procedurally, a district court must, as my colleagues say, adequately "show its work." *United States v. Woodside*, 895 F.3d 894, 900 (6th Cir. 2018). That is, the district court must "identify the evidence" that supports its drug-quantity finding in order to facilitate our appellate review. *United States v. Baro*, 15 F.3d 563, 569 (6th Cir. 1994). *Compare United States v. Woodside*, 642 F. App'x 490, 496 (6th Cir. 2016) *and United States v. Orlando*, 281 F.3d 586, 600–01 (6th Cir. 2002), *with United States v. Henley*, 360 F.3d 509, 515 (6th Cir. 2004) *and United States v. Ward*, 68 F.3d 146, 148–51 (6th Cir. 1995). Substantively, the district court must "err on the side of caution" when choosing between equally "plausible estimates" of the drug quantity. *Walton*, 908 F.2d at 1302. Under this cautious approach, a court should find that the defendant "is more likely than not" responsible for the *specific* amount that the court identified or for some "*greater*" amount. *Id.* (emphasis added).

Histed and the government relied on these basic legal rules to argue for far different drug quantities. Histed sought a base offense level of 30—one that held him responsible for 50 to 150 grams of ice or 500 to 1,500 grams of a meth mixture. *See* U.S.S.G. § 2D1.1(c)(5). He alleged that the evidence allowed the court to consider only the 122.2 grams of ice that he left behind as he fled the police (plus a small amount of drugs that does not matter to this appeal).

The government sought a base offense level of 34—one that held Histed responsible for 500 to 1,500 grams of ice or 5,000 to 15,000 grams of a meth mixture. *See id.* § 2D1.1(c)(3). To justify this higher number, the government relied on the hearsay statements of two confidential informants in addition to the 122.2 grams of ice found at the scene. It introduced this hearsay at the sentencing hearing through an investigating officer's testimony. One informant allegedly traveled with Histed to buy between one and three pounds of methamphetamine on five occasions. Another informant saw Histed buy ten pounds of methamphetamine from his supplier. Conservatively, this hearsay would lead to an additional 15 pounds (6,804 grams) of a meth mixture.

"At an absolute minimum," the government alternatively argued, the evidence recovered from Histed's truck after he fled the police would support a base offense level of 32. Mem., R.42, PageID 154 n.2. This level held Histed responsible for 150 to 500 grams of ice or 1,500 to 5,000 grams of a meth mixture. U.S.S.G. § 2D1.1(c)(4). The police seized several items from Histed's truck: five empty heat-sealed bags; a glass meth pipe; a box for a digital scale; an envelope with names and numbers scribbled on it; and the message "If you want a QP for 1100 can do" on a paper plate. Residue on one of the heat-sealed bags tested positive for methamphetamine. The investigating officer opined that each bag could have held one to two pounds of methamphetamine for a total of five to ten pounds (2,268 to 4,536 grams). He also described the envelope as a makeshift "drug ledger" because it had the names of Histed's "known associates" next to numbers that likely represented "dollar amounts" for debts "that were owed" for past drug sales. Sent. Tr., R.66, PageID 368. And the officer believed that the "QP" on the paper plate stood for a "quarter pound" of meth. *Id.*, PageID 371–72.

Ultimately, the district court did not accept either side's primary argument. On the one hand, the court had "no doubt" ("far beyond a preponderance") that Histed distributed more than the 122.2 grams of ice that he claimed. *Id.*, PageID 456. According to the court, "overwhelming evidence" showed that Histed "regularly engaged in the drug trafficking trade," and one could reasonably argue that his base offense level should even exceed the government's requested level of 34. *Id.* On the other hand, the court did not credit the confidential informants' accusations. *Id.* It refused to give their statements weight because Histed could "make a reasonable defense

argument" that the informants had "impaired" credibility and because the government had not introduced their statements through live testimony. *Id.*, PageID 457.

Balancing these conflicting concerns, the court opted for a base offense level of 32. *Id.* It reached that result because it needed to find "very little additional weight" above the 122.2 grams of ice to move up to this base offense level: only "30 grams of meth ice" or "300 grams of [a] meth mixture[.]" *Id.* Later in the hearing, the court reiterated that it had not "relied on" the informants' accusations. *Id.*, PageID 478. Rather, it had relied on "other things"—Histed's "statements," the "physical evidence," and his "history of dealing with meth"—to make its "confident" calculation that he was responsible for well more than the 122.2 grams of ice. *Id.*

I would affirm this decision because of our deferential standards of review. Our caselaw makes clear that we review the district court's drug-quantity finding (a finding of fact) for clear error. *See Gardner*, 32 F.4th at 524; *Walton*, 908 F.2d at 1300–01. This standard requires us to uphold the chosen quantity as long as it is "plausible on the record as a whole." *United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022). At the same time, our caselaw is less clear on the standard of review governing the procedural claim that the district court did not explain its decision enough to allow for meaningful appellate review. In other contexts, courts have reviewed this type of question (about how much reasoning a court must provide to support a decision) for an abuse of discretion. *See Concepcion v. United States*, 597 U.S. 481, 501 (2022); *Gall v. United States*, 552 U.S. 38, 50–51 (2007); *United States v. Johnson*, 553 F.3d 990, 997–98 (6th Cir. 2009); *cf. Chavez-Meza v. United States*, 138 S. Ct. 1959, 1965 (2018). And we have suggested that a court acts within its discretion if it "makes generally clear the rationale" for its conclusion. *Johnson*, 553 F.3d at 998 (citation omitted); *cf. Concepcion*, 597 U.S. at 500–01.

Reviewed under these deferential standards, the district court's drug-quantity finding survives our procedural and substantive checks. Start with the procedural check. The court reasonably "identif[ied] the evidence" that led to its chosen quantity: the undisputed 122.2 grams of ice plus at least 30 grams of ice or 300 grams of a meth mixture. *Baro*, 15 F.3d at 569. When initially choosing a base offense level of 32, the court refused to credit the confidential informants. This logic thus left the physical evidence—as the government had suggested in its alternative argument. Indeed, the court later clarified that it relied on the "physical evidence"

combined with Histed's "history of dealing with meth" to choose this base offense level. Sent. Tr., R.66, PageID 478. Its reasoning allows for meaningful "appellate review." *Woodside*, 642 F. App'x at 496. We must simply ask whether the physical evidence plausibly made it "more likely than not" that Histed distributed an amount "greater than or equal to" the additional 30 grams of ice or 300 grams of a meth mixture that the court found. *Walton*, 908 F.2d at 1302.

To be sure, I agree that the district court could have said more. The court, for example, did not identify a *specific* drug quantity. It instead held Histed responsible for the range overlapping with its chosen base offense level of 32 (150 to 500 grams of ice or 1,500 to 5,000 grams of a meth mixture). U.S.S.G. § 2D1.1(c)(4). The court also did not identify which *specific* parts of the physical evidence led it to increase Histed's quantity by the required 30 grams of ice or 300 grams of a meth mixture. Did the court find that Histed had a pound (453.6 grams) of a meth mixture in the heat-sealed bags? Or did it find that the debts listed in Histed's drug ledger corresponded to similarly sized drug deals? Or did it take some other route? We do not know.

But I do not believe that the district court's (perhaps "uninspiring") analysis warrants reversal. *United States v. Montgomery*, 787 F. App'x 272, 277 (6th Cir. 2019). For one thing, we have never required district courts to identify a specific quantity with "mathematical" precision. *Baker*, 750 F. App'x at 437. Rather, we routinely affirm district courts when they hold defendants responsible for a *general* range that corresponds with a base offense level. *See Gardner*, 32 F.4th at 524 ("five to 15 kilograms of cocaine"); *United States v. Penaloza*, 784 F. App'x 341, 347 (6th Cir. 2019) ("fifty to 150 kilograms of cocaine"); *United States v. Fitzgerald*, 754 F. App'x 351, 367 (6th Cir. 2018) ("between 15 and 50 kilograms of cocaine" for two defendants and "between 5 and 15 kilograms of cocaine" for another). So I see no problem with the district court's decision to hold Histed responsible for "at least" the amount of drugs that would render him subject to a base offense level of 32. *Cf. Jeross*, 521 F.3d at 570 ("at least 100,000 Ecstasy pills").

For another thing, we do not require district courts to identify the specific factual theory that led to their chosen drug quantity so long as the evidence on which they rely plausibly permitted them to find that quantity. In other words, courts need only "cover[] the basics" by

identifying the evidence supporting their numbers. *Montgomery*, 787 F. App'x at 277. Take *United States v. Owusu*, 199 F.3d 329 (6th Cir. 2000). There, the district court held a defendant accountable "for over 150 kilograms of cocaine." *Id.* at 344. To justify this finding, the court cited an accomplice's testimony that summarized dozens of transactions over many years. *Id.* at 344–45. We described the chosen quantity as a "conservative estimate" and nowhere opined that the district court should have identified *each and every* alleged drug deal on which it relied to reach 150 kilograms. *Id.* at 345. Or take *Henley*. There, the district court held the defendant liable for "over five kilograms of methamphetamine[.]" 360 F.3d at 515–16. The court identified a witness's testimony "alone" as "the particular evidence on which it relied[.]" *Id.* Again, this witness detailed many transactions over a substantial period. *Id.* And again, we upheld the chosen quantity without requiring the court to identify the specific drug deals it credited. *Id.*

I do not see why this case should be any different. The court identified the evidence on which it relied: the physical evidence. And while that evidence might have justified a much larger drug quantity, the court took the "conservative" path by holding Histed liable only for the small amount necessary to trigger the next base offense level. *Owusu*, 199 F.3d at 345.

The cases on which my colleagues rely do not change things. *See United States v. Reed*, 72 F.4th 174, 192 (6th Cir. 2023); *Woodside*, 642 F. App'x at 495–96; *Orlando*, 281 F.3d at 600–01. In *Reed*, for example, the district court did not cite any evidence (and we could not identify any) justifying its finding that the defendant had distributed pure ("actual") meth rather than a meth mixture. 72 F.4th at 191–93. In *Woodside*, the district court confronted a complex conspiracy with "many moving parts," but it left "its methodology" for choosing the drug quantity for one particular conspirator "totally opaque[.]" 642 F. App'x at 496; *see also Orlando*, 281 F.3d at 600–01. None of these problems exists here. Unlike in *Woodside*, this case is simple. It does not involve a lengthy conspiracy with many different actors engaged in many different drug transactions. It involves a single person's drug distribution. And unlike in *Reed*, the district court identified the evidence that supported (and did not support) its decision: the physical evidence rather than the informants' hearsay. By requiring the district court to do more in this case, my colleagues enlarge the scope of our procedural "check." I fear that this

expansion will only lead to wasteful remands in cases where the district court's general path is clear.

Although my colleagues do not reach the question, I believe that the district court's drug-quantity finding survives our "substantive" check too. The court did not commit clear error in holding Histed responsible for 30 grams of ice or 300 grams of a meth mixture on top of the 122.2 grams of ice found at the scene. *Estrada-Gonzalez*, 32 F.4th at 615. Among other evidence, the residue in one of the empty bags tested positive for methamphetamine and this bag alone could have held up to two pounds (907 grams). *Cf. Phipps*, 524 F. App'x at 213; *Caro-Silva*, 815 F. App'x at 842. In addition, the note on the paper plate found in Histed's truck suggested that he charged $1,100 per quarter pound of meth. His drug ledger had dollar values that added up to well over $1,100. *Cf. Murillo-Almarez*, 602 F. App'x at 311; *United States v. McKinley*, 19 F. App'x 274, 279–80 (6th Cir. 2001). All told, the district court could have attributed much more drugs to Histed. So it plausibly found it "more likely than not" that he was accountable "for a quantity greater than or equal to" its cautious estimate. *Walton*, 908 F.2d at 1302.

Histed responds that the district court arbitrarily "split the difference" between his requested drug quantity and the government's. *Cf. United States v. Claybrooks*, 729 F.3d 699, 706–07 (7th Cir. 2013). He claims that the court had no other option but to accept either the government's factual theory or his own. Yet the district court did not arbitrarily pick a "middle" number. It rejected the government's request because that request turned on the informants' discredited hearsay. Besides, Histed's argument contradicts our law. When reviewing a drug-quantity finding, we ask whether enough evidence supported a "quantity *greater than* or equal to the quantity" chosen. *Walton*, 908 F.2d at 1302 (emphasis added). We do not ask whether enough evidence supported the precise number. So if substantial evidence supported the government's larger proposed amount, we would generally uphold a district court's in-the-middle choice. I also fail to see how Histed's position would benefit criminal defendants in the long run. If forced to choose between a defendant's method for calculating the drug quantity and the government's, I suspect that district courts may well side with the government more frequently. So a "no middle ground" view would lead to higher base offense levels (not lower

ones) as compared to our current law—which encourages district courts to "err on the side of caution." *Id.*

\* \* \*

My colleagues reverse the district court because of an alleged guidelines error, so they do not address Histed's final argument that the court imposed a substantively unreasonable sentence. Because I would reject Histed's guidelines claim, I must reach this final challenge. Our court reviews the substantive reasonableness of Histed's 300-month sentence for an abuse of discretion. *Gardner*, 32 F.4th at 530. And the sentence comes with a strong presumption of reasonableness because it fell 60 months below the bottom of Histed's guidelines range: 360 months to life imprisonment. *See United States v. Lynde*, 926 F.3d 275, 279 (6th Cir. 2019).

Histed argues that the district court failed to adequately consider the cumulative effect of his many sentencing enhancements and his chronic addiction to methamphetamine when imposing the sentence. Yet the court considered both factors and explained why neither supported an even greater variance. When Histed spoke to the court during his allocution, he still had not "accepted responsibility for" his drug trafficking and sought "to point the finger at other people" to excuse his misconduct. Sent. Tr., R.66, PageID 478. The court thus found it "hard" to vary downward at all given what it "heard in the allocution[.]" *Id.*, PageID 480. But it opted to vary downward by 60 months because, contrary to Histed's present claim, it recognized that some of Histed's sentencing enhancements did "overlap." *Id.*, PageID 480–81. And it acknowledged Histed's "long history of substance abuse" when recommending treatment programs. *Id.*, PageID 484. Although Histed would have preferred that the district court impose an even greater variance, the court reasonably balanced the relevant sentencing factors when choosing the variance that it did. *See Lynde*, 926 F.3d at 282. Our law requires nothing more.

For these reasons, I would affirm. So I respectfully concur in part and dissent in part.